No. 12-16258

IN THE

# United States Court of Appeals for the Ninth Circuit

CHRISTOPHER BAKER,

Plaintiff-Appellant,

v.

LOUIS KEALOHA *et al.*,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Hawaii, No. 1:11-cv-00528-ACK-KSC
Senior District Judge Alan C. Kay

## BRIEF FOR *AMICUS CURIAE*
## BRADY CENTER TO PREVENT GUN VIOLENCE

Mark M. Murakami
DAMON KEY LEONG KUPCHAK HASTERT
1003 Bishop Street, Suite 1600
Honolulu, HI 96813

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005

Jonathan L. Diesenhaus
Matthew C. Sullivan
Cyrus Y. Chung
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Counsel for *Amicus Curiae*

August 14, 2012

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Brady Center to Prevent Gun Violence states that it has no parent corporations, nor has it issued shares or debt securities to the public. The Brady Center to Prevent Gun Violence is a § 501(c)(3) non-profit corporation, and no publicly held corporation holds ten percent of its stock.

/s/ Mark M. Murakami
Mark M. Murakami

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT

INTEREST OF *AMICUS* ......................................................................... 1

INTRODUCTION ................................................................................... 2

ARGUMENT ........................................................................................... 4

    I.    THE HAWAII PROVISIONS AT ISSUE DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY BECAUSE THEY DO NOT IMPACT THE RIGHT TO POSSESS FIREARMS IN THE HOME PROTECTED IN *HELLER* AND *MCDONALD*. ................................ 4

        A.    Courts Post-*Heller* Have Agreed That The Second Amendment Does Not Extend Beyond the Home To Protect Public Gun Carrying. ..................................................... 7

        B.    The Right Recognized In *Heller* Is Subject To Historical Restrictions and Prohibitions on Public Carrying of Firearms. .................................................................................. 11

    II.    EVEN IF HAWAII'S PERMITTING PROCESS IMPLICATES SECOND AMENDMENT RIGHTS, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY. ..................................................................................... 17

        A.    Strict Scrutiny Does Not Apply ............................................... 17

        B.    The Statute Satisfies Appropriate Scrutiny .............................. 18

CONCLUSION ..................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andrews v. State*,
  50 Tenn. 165 (1871)..........................................................................14

*Aymette v. State*,
  21 Tenn. 154 (1840)..........................................................................14

*Bateman v. Perdue*,
  No. 5:10-CV-265-H, 2011 WL 1261575 (E.D.N.C. Mar. 31, 2011)..............8, 9

*Bliss v. Commonwealth*,
  12 Ky. 90 (1822).............................................................................14

*Commonwealth v. Robinson*,
  600 A.2d 957 (Pa. Super. Ct. 1991) ...................................................23

*Commonwealth v. Romero*,
  673 A.2d 374 (Pa. Super. Ct. 1996) ...................................................23

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..................................................................*passim*

*Dorr v. Weber*,
  749 F. Supp. 2d 993 (N.D. Iowa 2010) ...............................................9

*English v. State*,
  35 Tex. 473 (1871) ..........................................................12, 13, 15

*Ex parte Thomas*,
  97 P. 260 (Okla. 1908)...................................................................14

*Ezell v. Chicago*,
  651 F.3d 684 (7th Cir. 2011)..............................................................8

*Fife v. State*,
  31 Ark. 455 (1876) .......................................................................13

*Gonzalez v. Village of W. Milwaukee*,
  No. 09CV0384, 2010 WL 1904977 (E.D. Wis. May 11, 2010).........................9

ii

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ....................................................8

*Hill v. State*,
53 Ga. 472 (1874) ........................................................................................14

*Kachalsky v. Cacace*,
817 F. Supp. 2d 235 (S.D.N.Y. 2011) ............................................................8

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ........................................................................*passim*

*Moore v. Madigan*,
842 F. Supp. 2d 1092 (C.D. Ill. 2012) ........................................................... 9

*People v. Mimes*,
953 N.E.2d 55 (Ill. App. Ct. 2011) ..............................................................19

*People v. Williams*,
962 N.E.2d 1148 (Ill. App. Ct. 2011) ...........................................................10

*People v. Williams*,
964 N.E.2d 557 (Ill. App. Ct. 2011) .............................................................19

*People v. Yarbrough*,
86 Cal. Rptr. 3d 674 (Cal. Ct. App. 2008) .....................................................19

*Richard v. County of Yolo*,
821 F. Supp. 2d 1169 (E.D. Cal. 2011) ...........................................................9

*Riddick v. United States*,
995 A.2d 212 (D.C. 2010) ............................................................................10

*Robertson v. Baldwin*,
165 U.S. 275 (1897) .................................................................. 3, 5, 7, 11, 12

*Robertson v. City & County of Denver*,
874 P.2d 325 (Colo. 1994) ...........................................................................18

*State v. Ancheta*,
220 P.3d 1052, 2009 WL 3776408 (Haw. Ct. App. 2009) ..........................10, 23

*State v. Buzzard*,
  4 Ark. 18 (1842) ......................................................................14

*State v. Cole*,
  665 N.W.2d 328 (Wis. 2003) ...................................................18

*State v. Dawson*,
  159 S.E.2d 1 (N.C. 1968)........................................................18

*State v. Hamdan*,
  665 N.W.2d 785 (Wis. 2002) ...................................................18

*State v. Jumel*,
  13 La. Ann. 399 (1858)............................................................14

*State v. Knight*,
  218 P.3d 1177 (Kan. Ct. App. 2009) ........................................10

*State v. Mendoza*,
  920 P.2d 357 (Haw. 1996) .......................................................18

*State v. Rabago*,
  686 P.2d 824 (Haw. 1984) .......................................................10

*State v. Workman*,
  35 W. Va. 367 (1891) ..............................................................14

*Trinen v. City of Denver*,
  53 P.3d 754 (Colo. Ct. App. 2002)...........................................18

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010)....................................................18

*United States v. Hart*,
  726 F. Supp. 2d 56 (D. Mass. 2010)...........................................9

*United States v. Hayes*,
  555 U.S. 415 (2009).....................................................................1

*United States v. Laurent*,
  --- F. Supp. 2d ----, No. 11-CR-322, 2011 WL 6004606 (E.D.N.Y. Dec.
  2, 2011)........................................................................................9

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ..............................................................18

*United States v. Masciandaro*,
   638 F.3d 458 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (2011) ..............2, 7, 8

*United States v. Reese*,
   627 F.3d 792 (10th Cir. 2010) ........................................................18

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) .............................................18

*United States v. Tooley*,
   717 F. Supp. 2d 580 (S.D.W. Va. 2010) ..............................................9

*United States v. Walker*,
   380 A.2d 1388 (D.C. 1977) ...........................................................19

*Woollard v. Sheridan*,
   --- F. Supp. 2d ----, Civil Case No. L-10-2068, 2012 WL 695674, at *6
   (D. Md. Mar. 2, 2012) .................................................................8

## STATUTES

720 ILCS 5/24-2(a)(14) ....................................................................8

720 ILCS 5/24-2(b)(4) .....................................................................8

Ark. Act of Apr. 1, 1881 ..................................................................13

D.C. Code § 22-4504 .......................................................................5

Haw. Rev. Stat. § 134-5 ..................................................................23

Haw. Rev. Stat. § 134-9 ..................................................................11

Haw. Rev. Stat. § 134-25 .............................................................23, 24

Kan., Ordinance No. 16, § XI ...........................................................13

Stat. of Northampton, 2 Edw. III, c.3 ..............................................12, 15

Tex. Act of Apr. 12, 1871 ....................................................................13

Wyo. Comp. Laws ch. 52, § 1 .............................................................13

CONSTITUTIONAL PROVISIONS

Ky. Const. of 1850, art. XIII, § 25 .......................................................14

U.S. Const., amend. II ..................................................................*passim*

OTHER AUTHORITIES

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683
(2007) ............................................................................................18

Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and
Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (Nov. 2009) ...................22

Darrell A.H. Miller, *Guns As Smut: Defending the Home-Bound Second
Amendment*, 109 COLUM. L. REV. 1278 (2009)...........................15, 17

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive
and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE
& VICTIMS 257 (2000) ....................................................................20

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34
ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002)....................22

David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on
Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193 (1995).......21, 22

Dennis A. Henigan, *The Woollard Decision and the Lessons of the Trayvon
Martin Tragedy*, 71 MD. L. REV. 1188 (2012)....................................8

Don B. Kates, *Handgun Prohibition and the Original Meaning of the
Second Amendment*, 82 MICH. L. REV. 204 (1983)...........................16

Ernst Freund, *The Police Power, Public Policy and Constitutional Rights*
(1904) ............................................................................................16

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 (May 1998) ..................................................................................21

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L. J. 259 (1874) ....................................................16

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998).........................21

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868)...............14

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004).....................................................................21

John Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289 (2003)....................................20

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868) ........................................................................................16

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004) ............................................................................................................20

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001)..........20

Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000).....................20

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 AM. J. PUB. HEALTH 1988 (Dec. 2002) ...............................................................................20

Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007)....................................................19

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L. REV. 1 (2012) ...............................................................15

Patrick J. Charles, *Scribble Scrabble, The Second Amendment and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm,* 105 NW. U. L. REV. COLLOQUY 225 (2011). ..............................16

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009) ...........................22

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379 (2006).........................................................................................22

Violence Policy Center, *Concealed Carry Killers* (2012) ....................................20

Violence Policy Center, *States With Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (Oct. 2011)..............................................3, 21

No. 12-16258

CHRISTOPHER BAKER,

Plaintiff-Appellant,

v.

LOUIS KEALOHA *et al*.,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Hawaii, No. 1:11-cv-00528-ACK-KSC
Senior District Judge Alan C. Kay

**BRIEF FOR *AMICUS CURIAE***
**BRADY CENTER TO PREVENT GUN VIOLENCE**

**INTEREST OF *AMICUS***

*Amicus* Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, it has filed numerous *amicus curiae* briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3095 n. 13, 3105 n. 30, 3107 n. 34 (2010) (Stevens, J., dissenting) (citing Brady Center brief), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), and *District*

*of Columbia v. Heller*, 554 U.S. 570 (2008). *Amicus* brings a broad and deep perspective to the issues raised here and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

## INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), is unique among constitutional rights in the risks that it presents. Guns are designed to kill, and both gun possession and use subject others to a serious, often deadly, risk of harm. While *Heller* held that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun *in the home* for self-defense, it has *never* recognized a far broader right to carry guns in public. *Id.* at 635. That restraint is well-founded. As this Court's sister Circuits have cautioned, the risks associated with gun carrying could "rise exponentially as one moved the right [announced in *Heller*] from the home to the public square." *United States v. Masciandaro*, 638 F.3d 458, 465 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (2011). Neither *Heller* nor history undermines the longstanding authority of states to restrict public carrying of guns.

Hawaii's strong gun laws restricting the carrying of guns in public have helped it achieve the lowest gun death rate in the nation, less than a third the

2

national average.[1]  Such restrictions have deep roots in English and early American

law, and have long been recognized *not* to implicate the right to bear arms.  *Heller*

stands firmly in that unbroken line of history.  It left intact longstanding precedent

that "the right of the people to keep and bear arms (article 2) is not infringed by

laws prohibiting the carrying of concealed weapons," *Robertson v. Baldwin*, 165

U.S. 275, 281-82 (1897), and expressly approved of decisions upholding

"prohibitions on carrying concealed weapons," as well as "the historical tradition

of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S.

at 626-27 & n.26.

Hawaii's handgun permit requirements are part of that longstanding

tradition, and the District Court correctly upheld those requirements.  The District

Court's decision is consistent with the "assurances" of *Heller* and *McDonald* that

"reasonable firearms regulations" remain permissible, and the Supreme Court's

well-established recognition that the exercise of protected activity must be

balanced against legitimate public interests—chief among which is public safety.

*McDonald*, 130 S. Ct. at 3047; *Heller*, 554 U.S. at 626-27 & n.26.   At least 40

courts—federal and state, trial and appellate—have either concluded that the

Second Amendment does not extend beyond the home or have upheld restrictions

---

[1]     Violence Policy Center, *States With Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (Oct. 2011), available at http://www.vpc.org/press/1110gundeath.htm.

or prohibitions on public carrying.  *See, e.g.*, *infra* Section I.A.  This Court should

join that body of case law and affirm the judgment of the District Court.

## ARGUMENT

Hawaii's handgun permitting process is constitutional for two reasons.  First,

the permitting process does not burden the right of a law-abiding citizen to possess

guns in the home and therefore does not implicate protected Second Amendment

activity.  Second, even if it does, the permitting process would survive the

applicable level of scrutiny because it is well-tailored to furthering Hawaii's

interest in public safety, an interest the Supreme Court has deemed compelling.

## I.  THE HAWAII PROVISIONS AT ISSUE DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY BECAUSE THEY DO NOT IMPACT THE RIGHT TO POSSESS FIREARMS IN THE HOME PROTECTED IN *HELLER* AND *MCDONALD*.

The Supreme Court's decision in *Heller* recognized that the Second

Amendment protects "the right of law-abiding, responsible citizens to use arms *in*

*defense of hearth and home*."  *Heller*, 554 U.S. at 635 (emphasis added).  The

Court only recognized Heller's right "to carry [] *in the home*," *id.* (emphasis

added), and did not endorse the carrying of firearms in public.  *See id.*  It focused

on the historical recognition of the right of individuals "to keep and bear arms to

defend their homes, families or themselves," *id.* at 615 (internal quotation marks

omitted), and the continuing need to keep and use firearms "in defense of hearth

and home."  *Id.* at 635.  Thus it held only that "the District's ban on handgun

4

possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense." *Id.* at 635 (emphasis added); *see also Robertson v. Baldwin*, 165 U.S. at 281-82 ("[T]he right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons.").

Appellant argues, in essence, that the *Heller* Court embraced a constitutional right to carry guns in public, but for some reason chose not to say so explicitly. That misreads *Heller*. Appellant cannot explain why the Court, though expounding upon a wide range of gun laws beyond those directly at issue, and aware that District law barred (and still bars) Mr. Heller from carrying guns in public, openly or concealed, repeatedly and explicitly stated that it was only granting him a right to "carry [] in the home." *Heller*, 554 U.S. at 635; D.C. Code § 22-4504. Appellant does not explain why the Court—despite dedicating Part III of its opinion to discussing numerous gun laws not at issue, and holding both that the Second Amendment was "not unlimited" and that a (non-exhaustive) host of gun laws remained "presumptively lawful"—did not even suggest Mr. Heller was being deprived of a right to carry guns anywhere *beyond* his home. Nor can Appellant explain why the *Heller* Court expressly approved of decisions upholding concealed carry bans, but chose not to state the inverse point that is crucial to his

5

argument: that some form of public carrying must be permitted. And any argument that the Court's approval of bans on carrying in sensitive places implied disapproval of bans on carrying in nonsensitive places ignores the Court's cautionary note: "We identify these presumptively lawful regulatory measures only as *examples*; our list does *not* purport to be exhaustive." *Id.* at 627 n.26 (emphasis added).

Neither is Appellant's argument aided by *Heller*'s statement that "bear" included carrying for confrontation. Appellant's Br. 18. That point merely supports the Court's conclusion, made in Part II of the opinion, that the right is not limited to military or militia use; nowhere does that discussion suggest that the right may be exercised outside the home. The Court's only discussion of where the right can be exercised was in its holding, which recognized a right to "carry [] in the home." *Heller*, 554 U.S. at 635.

Appellant also argues that because "self-defense has to take place wherever [a] person happens to be," his Second Amendment right must extend beyond the home. Appellant's Br. 20-23. Yet by this logic, almost no gun restriction could pass constitutional muster. Under such a view, laws forbidding carrying firearms in government buildings and sensitive places, or even by non-violent felons, would be suspect, as the need for potential self-defense could arise anywhere, from any

person, or at any time.[2]  The Supreme Court rightly rejected this view because it tolerates no limit.  *See Heller*, 554 U.S. at 627 & n.26.

In *McDonald*, the Court incorporated the Second Amendment to states, but "repeat[ed]" *Heller*'s "assurances" regarding its limited scope, and agreed that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment."  *McDonald*, 130 S. Ct. at 3046-47 (internal citation omitted).  Once again, the Court did not extend the Second Amendment right beyond the home, or cast doubt on *Robertson*.

### A. Courts Post-*Heller* Have Agreed That The Second Amendment Does Not Extend Beyond the Home To Protect Public Gun Carrying.

The District Court properly followed the reasoning of numerous state and federal courts that have held, post-*Heller*, that the Second Amendment does not protect a broad right to carry weapons in public.

The Circuits have exercised appropriate caution in defining the scope of the Second Amendment.  For example, the Fourth Circuit has declined to extend the Second Amendment right beyond the home, refusing to "push *Heller* beyond its undisputed core holding."  *Masciandaro*, 638 F.3d at 475.  The court reasoned:

> This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second

---

[2]  Appellant states that he "is not suggesting that Hawaii cannot regulate permitting and prevent the bearing of firearms in sensitive places, such as schools and government buildings," Appellant's Br. 24, but articulates no intelligible principle harmonizing that restriction with his broad pronouncement that his right must exist "wherever [a] person happens to be." *Id.* at 20.

Amendment rights. It is not far-fetched to think the *Heller* Court
wished to leave open the possibility that such a danger would rise
exponentially as one moved the right from the home to the public
square.

*Id.* at 475-76.[3] And the D.C. Circuit has warned against holding "longstanding"

handgun regulations—such as Hawaii's permit requirement—unconstitutional.

*Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*")

(noting that a longstanding regulation is one that "has long been accepted by the

public," and "concomitantly the activities covered by a longstanding regulation are

presumptively not protected from regulation by the Second Amendment"). [4]

Moreover, the vast majority of federal district courts have taken an approach

similar to the District Court in this case. *See Kachalsky v. Cacace*, 817 F. Supp. 2d

---

[3]     Two district courts within the Fourth Circuit improperly have disregarded
*Masciandaro*'s warning that the Supreme Court has not extended this right outside
the home, relying instead on Judge Niemeyer's minority views expressed in his
separate *Masciandaro* opinion. *Bateman v. Perdue*, No. 5:10-CV-265-H, 2011
WL 1261575 (E.D.N.C. Mar. 31, 2011); *Woollard v. Sheridan*, --- F. Supp. 2d ----,
Civil Case No. L-10-2068, 2012 WL 695674, at *6 (D. Md. Mar. 2, 2012). *See*
Dennis A. Henigan, *The* Woollard *Decision and the Lessons of the Trayvon Martin
Tragedy*, 71 MD. L. REV. 1188, 1191 (2012) (noting that *Woollard* "ignored the
Fourth Circuit's wise counsel, as [it] distorted the *Heller* ruling beyond
recognition").

[4]     Contrary to Appellant's suggestion, the Seventh Circuit's decision in *Ezell v.
Chicago*, 651 F.3d 684 (7th Cir. 2011), did *not* extend the right to carry beyond the
home. *See* Appellant's Br. 35-36. In *Ezell*, the court enjoined Chicago's post-
*McDonald* ban on firing ranges within the city because it directly impacted the
Second Amendment right to possess handguns *in the home*, given regulations
conditioning firearm licensing on completion of a firearm-safety course that
included range training. *Id.* at 689-90. In other words, "[t]he effect of the
ordinance [was] another complete ban on gun ownership within City limits." *Id.* at
712 (Rovner, J., concurring). *Ezell* did not call into question restrictions on *public*
gun carrying, as long as residents are able to transport guns to a range. *Id.* at 711;
*see also* 720 ILCS 5/24-2(a)(14), (b)(4) (allowing transportation of guns). At
most, *Ezell* recognizes a "corresponding right" to maintain proficiency that is
ancillary to exercising the right to self-defense in the home; it does not extend the
core right beyond the home.

235, 261, 264 (S.D.N.Y. 2011) (upholding New York's handgun-licensing regulations, and noting that "a right to carry a concealed weapon under the Second Amendment has not been recognized to date" and open carrying "is likewise outside the core Second Amendment concern articulated in *Heller*: self-defense in the home"). In fact, "many courts in other jurisdictions have reached a similar conclusion regarding the *Heller* decision." *Moore v. Madigan*, 842 F. Supp. 2d 1092, 1102 (C.D. Ill. 2012) (collecting cases); *see, e.g.*, *United States v. Laurent*, --- F. Supp. 2d ----, No. 11-CR-322, 2011 WL 6004606, at *22 (E.D.N.Y. Dec. 2, 2011) ("The right to self-defense in the home belongs to 'law-abiding citizens for lawful purposes.' It does not prohibit government regulation of firearms outside of the home or limitations on ownership of certain firearms; nor does it prevent the government from limiting the use of firearms for specific purposes or by specific people." (quoting *Heller*, 554 U.S. at 627)).[5]

State appellate courts have agreed that *Heller* is confined to the home. *See, e.g.*, *Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010); *People v. Williams*,

---

[5]    *See also Richard v. County of Yolo*, 821 F. Supp. 2d 1169, 1174 & n.4 (E.D. Cal. 2011); *Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *Dorr v. Weber*, 749 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) ("[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date."); *United States v. Hart*, 726 F. Supp. 2d 56, 60 (D. Mass. 2010); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D.W. Va. 2010) ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller*.").

962 N.E.2d 1148, 1152 (Ill. App. Ct. 2011) ("[T]he rulings in both *Heller* and *McDonald* made clear that the only type of firearms possession they were declaring to be protected under the second amendment was the right to possess handguns in the home for self-defense purposes."); *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("It is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes.").

The District Court's opinion here is thus fully consistent with the views of courts across the country after *Heller*. Although Appellant persists in arguing that Hawaii's laws criminalize in-home firearm possession to try to bring those laws within *Heller*'s holding, Appellant's Br. 24-27, that is simply wrong. Hawaii courts have required charges under those laws to "allege that the firearm at issue was away from [the defendant's] place of business, residence or sojourn." *State v. Ancheta*, 220 P.3d 1052, 2009 WL 3776408, at *7 (Haw. Ct. App. 2009) (table); *see also State v. Rabago*, 686 P.2d 824, 826 (Haw. 1984) (granting motion to dismiss charge because "[t]he entire event occurred within the garage of the defendant" and predecessor Place To Keep statute "allows a person to possess a firearm in their residence"). The District Court's opinion noted as much, and Appellant's desire to construe Hawaii's gun laws differently do not alter the holdings of Hawaii courts. Hawaii's firearm regulations therefore stand firmly

outside of *Heller*'s holding.

It would be unprecedented to hold now that the Constitution bars states and communities from restricting public gun carrying, or—as Hawaii has done—from allowing those tasked with protecting public safety to determine whether "the urgency or the need" to bring handguns into public spaces "has been sufficiently indicated." Haw. Rev. Stat. § 134-9. The District Court should be affirmed.

## B. The Right Recognized In *Heller* Is Subject To Historical Restrictions and Prohibitions on Public Carrying of Firearms.

A finding that Hawaii's handgun law does not implicate protected activity also would be fully consistent with the historical record of enumerated rights protected by the Second Amendment. The Supreme Court has stated that the Second Amendment codified a preexisting right, "inherited from our English ancestors . . . subject to certain well-recognized exceptions . . . which continue to be recognized as if they had been formally expressed." *Robertson*, 165 U.S. at 281; *see also Heller*, 554 U.S. at 592-95, 600-03, 605-19, 626-28 (tracing the right to bear arms through Anglo-American origins and state analogues); *McDonald*, 130 S. Ct. at 3056 ("[T]raditional restrictions" on the Second Amendment "show the scope of the right," just as they do "for *other* rights.") (Scalia, J., concurring). And *Heller* stated specifically that it was not "to cast doubt on longstanding prohibitions" in the history of Anglo-American jurisprudence. 554 U.S. at 626.

Among the "longstanding prohibitions" cited in *Heller* were "prohibitions on

11

carrying concealed weapons." *Heller*, 554 U.S. at 626; *see also Robertson*, 165 U.S. at 281-82 (one of those exceptions is that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons . . . ."). *Heller* also recognized the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" a limitation construed to allow for prohibitions on the public carrying of handguns. 554 U.S. at 627.

    *Heller* cited as authority for this "historical tradition" the 19th-century case of *English v. State*, 35 Tex. 473 (1871) (cited in *Heller*, 554 U.S. at 627), in which the Texas Supreme Court upheld a conviction for carrying a pistol in public under a statute banning the public carry of deadly weapons, including handguns. In reaching that conclusion, the court traced the history of analogous statutes, noting that Blackstone had characterized "the offense of riding around or going around with dangerous or unusual weapons" as a crime. 35 Tex. at 476. *English* traced the roots of such statutes back further through "the statute of Northampton (2 Edward III, c.3)," the "early common law of England," and even to "the laws of Solon" in ancient Greece. *Id.* The court rebuffed the argument that the Second Amendment prohibited such laws, noting that it was "useless to talk about personal liberty being infringed by laws such as that under consideration." *Id.* at 477. As such, it was a "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a

peaceable public assembly, as, for instance into a church . . . or any other place where ladies and gentlemen are congregated together." *Id.* at 478-79. The *English* court recognized that prohibiting the public carry of deadly weapons was important to prevent crime, and it quoted John Stewart Mill that "[i]t is one of the undisputed functions of government, to take precautions against crime before it has been committed, as well as to detect and punish afterwards," given "[t]he right inherent in society to ward off crimes against itself by antecedent precautions. . . ." 35 Tex. at 478.

English recognized that restrictions and prohibitions on public carrying were widespread: "It is safe to say that almost, if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration." *Id.* at 479. Indeed, even Wyatt Earp prohibited gun carrying in Dodge City. *See* Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876); *see also* 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *Hill v. State*, 53 Ga. 472,

474 (1874) ("at a loss to follow the line of thought that extends the guarantee"—

the state constitutional "right of the people to keep and bear arms"—"to the right to

carry pistols, dirks, Bowieknives, and those other weapons of like character,

which, as all admit, are the greatest nuisances of our day"); *State v. Workman*, 35

W. Va. 367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908)

("Practically all of the states under constitutional provisions similar to ours have

held that acts of the Legislatures against the carrying of weapons concealed did not

conflict with such constitutional provision denying infringement of the right to

bear arms, but were a valid exercise of the police power of the state . . . .");

*Aymette v. State*, 21 Tenn. 154, 159-61 (1840) ("The Legislature, therefore, have a

right to prohibit the wearing or keeping weapons dangerous to the peace and safety

of the citizens, and which are not usual in civilized warfare, or would not

contribute to the common defence."); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State

v. Jumel*, 13 La. Ann. 399, 400 (1858).[6]

    Another authority cited by *Heller*, 554 U.S. at 608, 613, 629, *Andrews v.

State*, 50 Tenn. 165, 188-89 (1871), similarly drew a sharp distinction between

carrying firearms at home and in public, explaining that "no law can punish" a man

---

[6]    *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which Kentucky's
Supreme Court held Kentucky's concealed-weapons ban in conflict with its
Constitution, is recognized as an exception to this precedent. *See* Joel Prentiss
Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868). In fact, the
legislature later corrected the anomalous decision by amending its constitution to
allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

"while he uses such arms at home or on his own property,"

> Yet, when he carries his property abroad, goes among the people in public assemblages where others are to be affected by his own conduct, then he brings himself within the pale of public regulation, and must submit to such restriction on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.

Accordingly, the historic scope of the right to keep and bear arms properly includes the understanding that restricting public carry was not understood to implicate the right. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L. REV. 1, 8 (2012) (hereinafter Charles, *Outside the Home*) (quoting 2 Edw. 3, c.3 (1328) (Eng.)); Darrell A. H. Miller, *Guns As Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278, 1318 n.246 (2009) (noting that Blackstone compared the Statute of Northampton to "the laws of Solon," under which "every Athenian was finable who walked about the city in armour") (quoting 2 William Blackstone, Commentaries *149).

Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places. For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th-century sources" commenting on the right to bear arms, 554 U.S. at 618, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed

15

weapons . . . ." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States,* 152-53 (1868). Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons." Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L. J. 259, 287 (1874). And an authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons," which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security." Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904).[7]

Such "restrictions began appearing on the carrying or using of 'arms' as a means to prevent public injury" since "the Norman Conquest." Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 NW. U. L. REV.

---

[7] An authority cited by the *Heller* Court on the Second Amendment's original meaning concluded that the only public carrying of firearms protected by the Second Amendment "is such transportation as is implicit in the concept of a right to possess—*e.g.*, transporting them between the purchaser or owner's premises and a shooting range, or a gun store or gun smith and so on." Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 267 (1983).

COLLOQUY 225 (2011). *See also* Darrell A. H. Miller, *supra* 15, at 1354 ("[S]tates and municipalities, far more sensitive to local needs and gun cultures, should be given free reign to design gun control policy that fits their specific demographic."). To hold that the Constitution dictates that public carry *must* be permitted carves into stone a rule that prevents state and local governments from adopting arms regulations which have been recognized since antiquity as one of the ways in which government protects the public good. The District Court's holding protects that legislative discretion that Appellant now seeks to eliminate.

## II. EVEN IF HAWAII'S PERMITTING PROCESS IMPLICATES SECOND AMENDMENT RIGHTS, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

### A. Strict Scrutiny Does Not Apply.

Contrary to Appellant's argument, *see* Appellant's Br. 40-41, *Heller* implicitly rejected any form of heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means and ends. The Court recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 554 U.S. at 636, and deemed a host of existing firearms regulations to be "presumptively lawful" without subjecting those laws to any analysis, much less heightened scrutiny. *Id.* at 626-27 & n.26. In the aftermath of *Heller* and *McDonald*, an overwhelming majority of Circuits have rejected strict scrutiny. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010); *United*

*States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc); *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010).

While these courts have applied some form of intermediate scrutiny, it bears note that state courts construing analogous state rights to bear arms have long applied a more deferential "reasonable regulation" test.[8] By that test, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City & County of Denver*, 874 P.2d 325, 328 (Colo. 1994); *accord State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996).[9]

**B. The Statute Satisfies Appropriate Scrutiny.**

By any measure, the law here is constitutional because there is a profound governmental interest in regulating the public carrying of firearms. Indeed, as the Illinois Appellate Court explained:

---

[8] *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87, n. 12 (2007) (describing "hundreds of opinions" by state courts with "surprisingly little variation" that have adopted the "reasonableness" standard for right-to-bear-arms cases).

[9] Though more deferential than intermediate scrutiny, the test is more demanding than rational basis, and does not possess the fatal flaw in the "interest balancing" test suggested by Justice Breyer's *Heller* dissent, because it does not permit states to prohibit all firearm ownership. On the contrary, under "reasonable regulation," laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), would be struck down. The test focuses on whether "the restriction . . . is a reasonable exercise of the State's inherent police powers." *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003).

18

> In his home, an individual generally may be better able to accurately assess a threat to his safety due to his familiarity with his surroundings and knowledge of his household's occupants. In public, however, there is no comparable familiarity or knowledge, and, thus, an increased danger that an individual carrying a loaded firearm will jump to inaccurate conclusions about the need to use a firearm for self-defense. The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force.

*People v. Williams*, 964 N.E.2d 557, 571 (Ill. App. Ct. 2011) (quoting *People v. Mimes*, 953 N.E.2d 55, 77 (Ill. App. Ct. 2011)); *accord People v. Yarbrough*, 86 Cal. Rptr. 3d 674, 682 (Cal. Ct. App. 2008); *United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (noting "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor"). The carrying of firearms in public introduces risks not presented by firearm possession in the home and thus undoubtedly implicates significant and important State interests. Three aspects are worthy of special note.

First, carrying firearms outside the home threatens the safety of a broader range of individuals. Firearms kept in the home are primarily a threat to gun owners, and their family members, friends, and houseguests.[10] But firearms

---

[10] *See, e.g.*, Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 Soc. Sci. & Med. 656 (Feb. 2007) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates."); Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership."); Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 Am. J.

carried in public present a threat to strangers, law enforcement offices, random passersby, and other citizens. Such guns expose all members of society to great risks, as guns are "used far more often to intimidate and threaten than they are used to thwart crimes." David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000). In the last five years, concealed handgun permit holders have shot and killed over 400 people, including fourteen law enforcement officers. *See* Violence Policy Center, *Concealed Carry Killers* (2012), *available at* http://vpc.org/ccwkillers.htm (last accessed August 8, 2012).

Second, carrying firearms in public is not an effective form of self-defense and, in fact, repeatedly has been shown to *increase* the chances that one will fall victim to violent crime. Most states that broadly allow concealed carrying of firearms in public appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted." John Donohue, *The Impact of Concealed-Carry Laws*, EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003). Laws broadly allowing concealed carrying of weapons "have resulted, if anything, in an *increase* in adult homicide rates." Jens Ludwig,

---

PUB. HEALTH 1988, 1988 (Dec. 2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide."); Mark Duggan, *More Guns, More Crime*, 109 J. POL. ECON. 1086 (2001); Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

*Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998). Likewise, "firearms homicides increased in the aftermath of [enactment of these] laws," and such laws may "raise levels of firearms murders" and "increase the frequency of homicide." David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995). Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted. Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 (May 1998). Hawaii, with its strong gun laws restricting the carrying of guns in public, has achieved the lowest gun death rate in the United States, less than a third the national average.[11]

   Analyses of the connection between increased gun prevalence and crime "indicate a rather substantial increase in robbery," John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623, 633 (2004), while "policies to *discourage* firearms in public may help prevent violence." McDowall *et al.*, *Easing Concealed Firearms Laws*, 86 J. CRIM. L. & CRIMINOLOGY at 203. Another study found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and

---

[11]    Violence Policy Center, *States With Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (Oct. 2011), available at http://www.vpc.org/press/1110gundeath.htm.

that "guns did not seem to protect those who possessed them from being shot in an assault." Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (Nov. 2009). Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public negatively implicates other social issues and portends societal ills unlike firearms in the home. For one, if drivers carry loaded guns, road rage can become a more serious and potentially deadly phenomenon. David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002). Increases in gun prevalence in public may cause an intensification of criminal violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379, 387 (2006).

Further, law enforcement's ability to protect themselves and the public could be greatly restricted if officers were required to presume that a person carrying a firearm in public was doing so lawfully. When the carrying of guns in public is

22

restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996).  By contrast, under an expansive Second Amendment regime, an officer might not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention.  Law enforcement should not have to wait for a gun to be fired before protecting the public.

The challenged provisions do not infringe on the Second Amendment rights of law-abiding, responsible citizens to carry a gun in the home for the self-defense. To the contrary, they specifically exempt possession within one's home and place of business.  *See, e.g.*, Haw. Rev. Stat. § 134-25; *Ancheta*, 2009 WL 3776408, at *7.  Hawaii law also allows the use of firearms for other purposes, including hunting, and allows for the transportation of weapons.  *See, e.g.*, Haw. Rev. Stat. § 134-5; *id.* § 134-25.  The Second Amendment does not forbid state or local governments from restricting the public carrying of firearms as Hawaii has done.

States have significant interests in averting the spike in gun crimes and accidental shootings that will result from unrestricted public carrying.  Hawaii has

devised a regulatory scheme that is well tailored to accomplish its interests in fostering a safe place for all. Accordingly, this Court should affirm the District Court and find Hawaii's statutes constitutional.

## CONCLUSION

For all the foregoing reasons, as well as those stated by Appellees, this Court should affirm the decision of the District Court.

Dated: August 14, 2012    Respectfully submitted,

          /s/ Mark M. Murakami
          Mark M. Murakami
          DAMON KEY LEONG KUPCHAK HASTERT
          1003 Bishop Street, Suite 1600
          Honolulu, HI 96813

          Jonathan L. Diesenhaus
          Matthew C. Sullivan
          Cyrus Y. Chung
          Hogan Lovells US LLP
          555 13th Street, NW
          Washington, DC 20004

          Jonathan E. Lowy
          Daniel R. Vice
          Brady Center to Prevent Gun Violence
          Legal Action Project
          1225 Eye Street, NW, Suite 1100
          Washington, DC 20005

          Counsel for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation Rule 29(d) and Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6170 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Rule 32(a)(5)(A) and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14-point font and in Times New Roman.

/s/ Mark M. Murakami
Mark M. Murakami

*Attorney for Amicus Brady Center to Prevent Gun Violence*

Dated: August 14, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2012, I filed this *Amicus Curiae* brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will electronically serve this brief on all parties and participants in this case.

/s/ Mark M. Murakami
Mark M. Murakami

Dated: August 14, 2012