IN THE SUPREME COURT OF THE STATE OF OREGON


STATE OF OREGON
and CITY OF PORTLAND,

Respondents on Review,

v.

JONATHAN D. CHRISTIAN,
aka Jonathan David Christian,

Petitioner on Review.


(CC 080951814; CA A142137; SC S060407)


On review from the Court of Appeals.*

Argued and submitted March 11, 2013, at Lewis & Clark College of Law, Portland.

Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review.  With him on the brief was Peter Gartlan, Chief Defender.

Harry Auerbach, Chief Deputy City Attorney, Portland, argued the cause and filed the brief for respondents on review.

Jerry Lidz, Eugene City Attorney's Office, filed the brief for *amicus curiae* League of Oregon Cities.  With him on the brief was Sean E. O'Day, League of Oregon Cities.

Robert M. Atkinson, Portland, filed the brief for *amicus curiae* Robert M. Atkinson.

Paul C. Elsner, Beery, Elsner & Hammond, LLP, Portland, filed the brief for *amici curiae* Major City Chiefs Association, International Municipal Lawyers Association, and The United States Conference of Mayors.  With him on the brief were Chad A. Jacobs, Portland, John Daniel Reaves, Washington DC, and Lawrence Rosenthal, Orange, California.

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Landau, and Baldwin, Justices.**

BALDWIN, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

*Appeal from Multnomah County Circuit Court, John A. Wittmayer, Judge. 249 Or App 1, 274 P3d 262 (2012).

**Brewer, J., did not participate in the consideration or decision of this case.

1          BALDWIN, J.

2          Defendant was convicted of several weapons-related charges based on his

3   possession of loaded semiautomatic handguns and a knife in a public place within the city

4   of Portland.  The Court of Appeals affirmed.  *State v. Christian*, 249 Or App 1, 274 P3d

5   262 (2012).  Defendant petitioned this court to review his convictions for violating a City

6   of Portland ordinance prohibiting the possession or the carrying of a firearm in a public

7   place having recklessly failed to unload it.  After considering defendant's constitutional

8   challenges to the ordinance under Article I, section 27, of the Oregon Constitution, and

9   under the Second Amendment to the United States Constitution, we conclude that the

10  ordinance enacted by the City of Portland is constitutional, and we affirm.

11                              I.  BACKGROUND

12         In September 2008, defendant entered a convenience store in Portland and

13  placed a black bag behind the counter.  Defendant then exited the store and sat on a chair

14  in front of the store.  Shortly thereafter, Officers Laws and Berne approached defendant.

15  Berne obtained defendant's consent to search him and found an empty firearm holster, a

16  loaded magazine, two knives, one of which was concealed in his pocket, and a can of

17  pepper spray.  Berne asked whether defendant had firearms nearby, and defendant stated

18  that he had placed firearms inside the store.  The officers entered the store and retrieved

19  the black bag from behind the counter.  With defendant's consent, the officers searched

20  the bag and discovered two loaded nine-millimeter semiautomatic handguns and

21  additional loaded magazines.  The officers obtained consent to search defendant's vehicle

22  and found a .22-caliber rifle, two sets of handcuffs, police batons, flashlights, and

1    binoculars.[1]

2            Defendant was charged with two counts of violating a state statute

3    prohibiting the carrying of a concealed firearm, two counts of violating a City of Portland

4    ordinance prohibiting the carrying of a firearm in a public place having recklessly failed

5    to unload it, and one count of violating a state law prohibiting the carrying of a concealed

6    knife.  With respect to the four firearm charges, the state alleged that defendant had

7    violated the state statute and Portland City Code (PCC) 14A.60.010 (ordinance),[2] by

8    carrying the two loaded handguns, concealed in the black bag, across a public sidewalk

---

[1]        We only briefly refer to the underlying facts, because defendant has not
asserted an "as applied" challenge to the ordinance at issue in this appeal.  *See* ORAP
5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of
error was preserved in the lower court and is assigned as error in the opening brief
* * *.").  An "as applied" constitutional challenge asserts that a law has been applied in a
manner that violates the rights of the person making the challenge even when a law is
constitutional on its face.  Here, defendant did not assert an "as applied" challenge to the
ordinance at any point in the proceedings before the Court of Appeals, and that court
concluded that defendant did not raise such a challenge.  *Christian*, 249 Or App at 3
(concluding that defendant challenged the ordinance facially).

[2]        PCC 14A.60.010(A) provides:

        "It is unlawful for any person to knowingly possess or carry a
firearm, in or upon a public place, including while in a vehicle in a public
place, recklessly having failed to remove all the ammunition from the
firearm."

The City of Portland was granted the authority to enact the ordinance under ORS
166.173(1), which provides:

        "A city or county may adopt ordinances to regulate, restrict or
prohibit the possession of loaded firearms in public places as defined in
ORS 161.015."

1    and into the convenience store.

2           Before trial, defendant filed motions to dismiss and a demurrer, arguing

3    that the state's concealed firearm statute and the city's ordinance violated Article I,

4    section 27, of the Oregon Constitution[3] and the Second Amendment to the United States

5    Constitution.[4] Defendant contended that the state statute and the city's ordinance were

6    unconstitutionally overbroad in violation of Article I, section 27, because, although either

7    could be constitutionally applied in some circumstances, the provisions impinged on the

8    constitutional right to bear arms for purposes of self-defense as recognized in *State v.*

9    *Hirsch/Friend*, 338 Or 622, 114 P3d 1104 (2005). Defendant further asserted that the

10   ordinance violated the Second Amendment as interpreted in *District of Columbia v.*

11   *Heller*, 554 US 570, 128 S Ct 2783, 171 L Ed 2d 637 (2008). The trial court overruled

12   the demurrer and denied defendant's motion to dismiss. The case proceeded to a bench

13   trial, and defendant was convicted on all charges.

14           Defendant appealed, challenging only the constitutionality of the Portland

15   ordinance. In a split *en banc* decision, the majority of the Court of Appeals affirmed,

---

[3]        Article I, section 27, of the Oregon Constitution provides:

           "The people shall have the right to bear arms for the defence of
           themselves, and the State, but the Military shall be kept in strict
           subordination to the civil power[.]"

[4]        The Second Amendment to the Unites States Constitution provides:

           "A well regulated Militia, being necessary to the security of a free
           State, the right of the people to keep and bear Arms, shall not be infringed."

3

concluding that the ordinance was not overbroad under Article I, section 27, and did not

otherwise violate the Second Amendment.  In interpreting the ordinance, the majority of

the Court of Appeals determined that a violation of the ordinance occurs when a person

*knows* that he or she possesses or carries a loaded firearm in a public place and *recklessly*

does so anyway by being aware of a substantial risk of harm and consciously

disregarding that risk.  *Christian*, 249 Or App at 5-6.  In contrast, under the construction

of the ordinance advanced by the parties, the ordinance is violated when a person, who is

not exempted from the ordinance, possesses a firearm in public and recklessly fails to

unload it.

We adopt the construction of the ordinance advanced by the parties,

determine that overbreadth challenges are not cognizable in Article I, section 27, cases,

and conclude that the ordinance is constitutional under Article I, section 27, of the

Oregon Constitution and under the Second Amendment to the United States Constitution.

## II.  ANALYSIS

A.    *Construction of the Portland Ordinance*

Our threshold task is to interpret the meaning and reach of the contested

ordinance.  As noted, PCC 14A.60.010(A) provides:

> "It is unlawful for any person to knowingly possess or carry a
> firearm, in or upon a public place, including while in a vehicle in a public
> place, recklessly having failed to remove all the ammunition from the
> firearm."

The ordinance sets out 14 exceptions to the prohibition, including an exception for

persons who are licensed by the State of Oregon to carry a concealed weapon.  Other

1  exceptions include police officers and members of the military in the performance of

2  their official duties, licensed hunters while engaging in hunting activities or traveling for

3  that purpose, and persons traveling to and from established target ranges.[5]

---

[5]      The exceptions, which also constitute affirmative defenses to a violation of the ordinance, are as follows:

"1.  A police officer or other duly appointed peace officers, whether active or honorably retired.

"2.  A member of the military in the performance of official duty.

"3.  A person licensed to carry a concealed handgun.

"4.  A person authorized to possess a loaded firearm while in or on a public building under ORS 166.370.

"5.  A government employee authorized or required by his or her employment or office to carry firearms.

"6.  A person summoned by a police officer to assist in making arrests or preserving the peace, while such person is actually engaged in assisting the officer.

"7.  A merchant who possesses or is engaged in lawfully transporting unloaded firearms as merchandise.

"8.  Organizations which are by law authorized to purchase or receive weapons from the United States or from this state.

"9.  Duly authorized military or civil organizations while parading, or their members when going to and from the places of meeting of their organization.

"10.  A corrections officer while transporting or accompanying an individual convicted of or arrested for an offense and confined in a place of incarceration or detention while outside the confines of the place of incarceration or detention.

"11.  Persons travelling to and from an established target range,

1    Many terms in the ordinance have plain meanings that the parties do not

2  dispute.  The term "public place" is defined within the Portland City Code in a manner

3  consistent with the legislative grant of authority "to regulate, restrict or prohibit the

4  possession of loaded firearms in public places as defined in ORS 161.015."  ORS

5  166.173(1); *see also* ORS 161.015 (defining"public places"); PCC 14A.10.010(O)

6  (providing definition of "public places" that parallels ORS 161.015).  PCC 14A.20.040

7  further provides that the city code "shall be construed so as to render it consistent with

8  state criminal law."  Because the city code does not define the terms "knowingly" and

9  "recklessly," those terms are to be defined as provided for under state criminal law.  By

10  incorporating state law, "knowingly" is therefore defined as follows:

11          "'Knowingly' or 'with knowledge,' when used with respect to conduct
12          or to a circumstance described by a statute defining an offense, means that a
13          person acts with an awareness that the conduct of the person is of a nature
14          so described or that a circumstance so described exists."

15  ORS 161.085(8).  "Recklessly" is likewise defined as follows:

---

whether public or private, for the purpose of practicing shooting targets at
the target ranges.

"12.  Licensed hunters or fishermen while engaged in hunting or
fishing, or while going to or returning from a hunting or fishing expedition.

"13.  A person authorized by permit of the Chief of Police to possess
a loaded firearm, clip, or magazine in a public place in the City of Portland.

"14.  A security guard employed at a financial institution insured by
the Federal Deposit Insurance Corporation while the security guard is on
duty."

PCC 14A.60.010(C).

"'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9).

In light of those definitions, the parties agree that the only ambiguity in the text of the ordinance relates to the meaning of the word "recklessly," based on the placement of that word. The Court of Appeals concluded that "recklessly," which appears in the second clause of the provision, modified the phrase "knowingly possess or carry a firearm" in the first clause of the provision. *Christian*, 249 Or App at 5-7. That interpretation requires that a person have knowledge that the firearm that he or she possesses in public is loaded and nevertheless recklessly proceed with an awareness that doing so creates an unreasonable and unjustifiable risk of harm. In contrast, the parties and the dissents below interpret the word "recklessly" to modify the phrase "having failed to remove all the ammunition from the firearm" and, as a result, adopt a broader construction of the ordinance. Under that construction, a person violates the ordinance if that person knowingly possesses or carries a firearm in public and is aware of and disregards a substantial risk that the firearm is loaded.

A grammatical reading of the ordinance is that "recklessly," an adverb, modifies the phrase that immediately follows it. *See Delgado v. Souders*, 334 Or 122, 132, 46 P3d 729 (2002) (interpretation of anti-stalking statute where placement of adverbs "intentionally," "knowingly," and "recklessly" immediately before the verb

"engage[]" demonstrated that the adverbs modified the verb). The first clause of the ordinance includes the adverb (and mental state) "knowingly," to modify the verbs "possess" and "carry." To also modify those verbs with "recklessly" unnecessarily creates ambiguity with respect to the required mental state for a conviction under the ordinance. We therefore conclude that the proper interpretation of the ordinance is the meaning agreed to by the parties. Therefore, a person violates the ordinance when he or she knowingly possesses or carries a firearm in a public place except under circumstances specifically exempted.

Based on that construction, we make several initial observations about the reach of the ordinance. First, the ordinance is not directed in any way to the manner of possession or use of firearms for self-defense within the home. By definition, the areas that the ordinance regulates are public places only. Second, the ordinance does not prohibit the mere possession of firearms in public places but specifically regulates only the manner of possession, namely, knowingly possessing or carrying a loaded firearm in public and recklessly failing to remove all of the ammunition. Third, with the exceptions noted, the ordinance prohibits possessing or carrying of loaded firearms in *all* public places. Significantly, the ordinance does not prohibit a person from knowingly possessing or carrying a loaded firearm in a public place if the "person [is] licensed to carry a concealed handgun." PCC 14A.60.010(C)(3).

With those points in mind, we return to the parties' arguments on review. Defendant challenges the ordinance under Article I, section 27, as facially overbroad. Defendant's overbreadth challenge is based on the contention that the individual right to

bear arms for the purpose of defense guaranteed by Article I, section 27, includes an

unlimited right to carry a loaded firearm in all public places in a manner that would allow

a person to immediately use the firearm to resist a deadly attack.

In response, the city and *amicus curiae* League of Oregon Cities (*amicus*)

make a principled argument that overbreadth challenges that question the validity of all

conceivable applications of a challenged law should not be cognizable in Article I,

section 27, cases. To inform our decision in this case, we first turn to a brief review of

our Article I, section 27, jurisprudence. We then examine the justification for

overbreadth challenges in Article I, section 27, cases.

B.      *Article I, Section 27, Right to Bear Arms*

Since statehood, Article I, section 27, has provided that "[t]he people shall

have the right to bear arms for the defence of themselves, and the State, but the Military

shall be kept in strict subordination to the civil power[.]" We have interpreted the

meaning and scope of that constitutional guarantee and the legislature's authority to

regulate the manner of possession or use of protected arms on several occasions.

We have held that Article I, section 27, prevents the legislature from

infringing on the people's individual right to bear arms for purposes limited to self-

defense. *State v. Kessler*, 289 Or 359, 614 P2d 94 (1980). In *Kessler*, we also concluded

that the term "arms" includes some firearms and certain hand-carried weapons commonly

used for self-defense at the time the provision was drafted. *Id.* at 368.

Of significance to this case, in *Kessler*, we considered early American

examples of restrictions on the rights of individuals to "carry or use" personal weapons:

"A 1678 Massachusetts law forbade shooting near any house, barn, garden, or highway in any town where a person may be 'killed, wounded, or otherwise damaged.' The courts of many states have upheld statutes which restrict the possession or manner of carrying personal weapons. The reasoning of the courts is generally that a regulation is valid if the aim of public safety does not frustrate the guarantees of the state constitution. For example many courts have upheld statutes prohibiting the carrying of concealed weapons, *see, e.g.*, *State v. Hart*, 66 Idaho 217, 157 P2d 72 (1945); and statutes prohibiting possession of firearms by felons, *see, e.g.*, *State v. Cartwright*, 246 Or 120, 418 P2d 822 (1966)."

*Id.* at 370 (footnote omitted). The conviction in *Kessler* was reversed because the underlying statute did not specifically regulate the manner of possession or use of a billy club; rather, the statute banned outright the mere possession of the club, a weapon commonly used for personal defense. *See also State v. Blocker*, 291 Or 255, 630 P2d 824 (1981) (conviction for mere possession of a billy club in public reversed when statute did not specifically regulate the use or manner of possession); *State v. Delgado*, 298 Or 395, 692 P2d 610 (1984) (same holding with respect to mere possession of a switchblade knife when prohibition a total ban).

We have also held that the drafters of Article I, section 27, did not intend to deprive the legislature of the authority to specifically regulate the manner of possession or use of arms when it determines that such regulation is necessary to protect public safety, including, for example, the enactment of a prohibition on the carrying of concealed weapons or a restriction on the possession of arms by felons as members of a group whose prior conduct demonstrated an identifiable threat to public safety. *See Hirsch/Friend,* 338 Or 622; *State v. Cartwright*, 246 Or 120, 418 P2d 822 (1966), *cert den*, 386 US 937 (1967); *State v. Robinson*, 217 Or 612, 343 P2d 886 (1959).

1    In *Robinson*, we rejected an Article I, section 27, challenge directed at a

2    statute prohibiting unnaturalized foreign-born persons and certain felons from owning or

3    possessing concealable firearms.  We concluded that Article I, section 27, was patterned

4    on Indiana state constitutional provisions, and we followed a persuasive decision of the

5    Indiana Supreme Court:

6        "Art I, § 27, was patterned upon and is identical to Art. I, §§ 32 and 33,
7        Constitution of Indiana.[6]  *McIntyre v. State*, 170 Ind 163, 83 NE 1005,
8        held that the Indiana provision (§ 32) permits reasonable regulation of the
9        right to bear arms and that accordingly legislation prohibiting the carrying
10       of concealed weapons is valid."

11   *Robinson*, 217 Or at 619.

12       In *Robinson*, we quoted with approval the observation made in *People v.*

13   *McCloskey*, 76 Cal App 227, 244 P 930 (1926), about the legislature's authority to

14   regulate the carrying and use of firearms to promote public safety:

15       "It has been held in a number of cases that the act is a valid and reasonable
16       exercise of the police power of the state.  It is a well-recognized function of
17       the legislature in the exercise of the police power to restrain dangerous
18       practices and to regulate the carrying and use of firearms and other
19       weapons in the interest of public safety * * *."

20   *Id.* at 618 (internal quotation marks omitted; omission in original).[7]

---

[6]    Article I, section 32, of the Indiana Constitution of 1851 provided that "[t]he people shall have a right to bear arms, for the defense of themselves and the State."

Article I, section 33, of the Indiana Constitution of 1851 provided that "[t]he military shall be kept in strict subordination to the civil power."

[7]    When *Robinson* was decided, courts commonly referred to "the police power of the state" when discussing the proper scope of legislative authority.  We discussed the subsequent change in the usage of that phrase in *Hirsch/Friend*:

1      Most recently, we extensively discussed the text and history of Article I,

2   section 27, in *Hirsch/Friend*, a case in which the crime of felon in possession of a

3   firearm, ORS 166.270(1), was challenged as infringing on the right to bear arms

4   guaranteed under that constitutional provision.  We concluded that, "in enacting ORS

5   166.270(1), the legislature acted within its proper authority to restrict the possession of

6   arms by the members of a group whose conduct demonstrates an identifiable threat to

7   public safety."  *Hirsch/Friend*, 338 Or at 679.

8      Our extensive summary in *Hirsch/Friend* of historical circumstances

---

"As noted, in both *Robinson* and *Cartwright*, this court grounded its conclusions that the statutory prohibition at issue did not contravene Article I, section 27, in the 'police power' doctrine, which generally seeks to determine whether a legislative enactment reasonably 'is in the interests of the public health, safety, and general welfare.' *Christian et al. v. La Forge*, 194 Or 450, 462, 242 P2d 797 (1952).  However, this court in more recent years has explained that any constitutional notion of the 'police power' does not refer to an independent source of legislative power itself; rather, it merely represents the legislature's general plenary power to legislate. *Dennehy v. Dept. of Rev.*, 305 Or 595, 604 n 3, 756 P2d 13 (1988);  *see also Eckles v. State of Oregon*, 306 Or 380, 399, 760 P2d 846 (1988), *cert dismissed*, 490 US 1032 (1989) ('[T]he "police power" is indistinguishable from the state's inherent power to enact laws and regulations; the existence of that power cannot explain the extent to which the power is constitutionally limited.').  The court similarly has clarified that 'the state cannot avoid a constitutional command by "balancing" it against another of the state's interests or obligations, such as protection of the "vital interests" of the people'; rather, any constitutional limitations on the state's actions 'must be found within the language or history' of the constitution itself. *Eckles*, 306 Or at 399."

338 Or at 638-39.  Thus, *Robinson* and *Cartwright* were properly decided because Article I, section 27, did not impose a constitutional limitation on the legislature's authority to enact the statutes upheld in those cases.

1    pertaining to Article I, section 27, included several important conclusions pertinent to the

2    resolution of this case.  First, the guarantee is not absolute:

> 3    "Nothing in the history of the English right suggests that the drafters of the
> 4    English Bill of Rights intended the arms provision to preclude the
> 5    disarmament of serious lawbreakers; indeed, the refusal of the King's
> 6    Bench in 1686 to enforce firearms restrictions against law-abiding citizens
> 7    reinforces that reading of the history.  That, in turn, counters any notion that
> 8    the traditional right to bear arms inherited from England provided an
> 9    absolute guarantee to those who violate criminal laws."

10    *Id.* at 675-76.  Second, in England and colonial America, the regulation of arms was

11    generally directed at public safety concerns

> 12    "such as restrictions extending to those who posed a threat to the public
> 13    peace or who were perceived to pose such a threat, and other prohibitions
> 14    on the carrying of concealed weapons and the carrying of weapons or
> 15    shooting of weapons in towns or crowded areas."

16    *Id.* at 677.  And, finally, we concluded that legislative enactments restricting arms must

17    satisfy the purpose of promoting public safety:

> 18    "[T]he legislature's authority to restrict the bearing of arms is [not] so broad
> 19    as to be unlimited.  Rather, any restriction must satisfy the purpose of that
> 20    authority in the face of Article I, section 27:  the protection of public
> 21    safety."

22    *Id.*

23    Because the right to bear arms is not an absolute right, our Article I, section

24    27, holdings reflect a judicial recognition that the legislature has wide latitude to enact

25    specific regulations restricting the possession and use of weapons to promote public

26    safety.  We have consistently acknowledged the legislature's authority to enact reasonable

27    regulations to promote public safety as long as the enactment does not unduly frustrate

28    the individual right to bear arms for the purpose of self-defense as guaranteed by Article

1    I, section 27.  In the United States generally, it has been recognized that the right to bear

2    arms is not absolute and that the exercise of legislative authority reasonably restricting

3    the right to bear arms to promote public safety is constitutionally permissible.  In

4    *Hirsch/Friend*, we observed that

5        "most courts addressing challenges to statutory restrictions have concluded
6        that state constitutional arms guarantees generally are subject to reasonable
7        restraints.  *See generally* John Levin, *The Right to Bear Arms: The*
8        *Development of the American Experience*, 48 Chi-Kent L Rev, 148, 159
9        (1971) (so noting).  Most significantly for our purposes * * *, the Indiana
10       Supreme Court construed Article I, section 20, of the Indiana Constitution
11       of 1816 -- which was virtually identical to Article I, section 27, of the
12       Oregon Constitution -- to allow legislative prohibition of the wearing or
13       carrying of concealed weapons."

14    338 Or at 648-49 (internal footnote omitted).[8]

15        As with a prohibition on the carrying of concealed weapons in the

16    nineteenth century, the ordinance at issue here reflects a contemporary legislative

---

[8]    As noted in *Heller*, generally, prohibitions on carrying concealed weapons have historically been upheld in the United States:

    "Like most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.  See, *e.g.*, *Sheldon*, in 5 Blume, 346; Rawle 123; Pomeroy 152-153; Abbott 333.  For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.  See, *e.g.*, *State v. Chandler*, 5 La Ann at 489-490; *Nunn v. State*, 1 Ga at 251; see generally 2 Kent *340, n 2; The American Students' Blackstone 84, n 11 (G. Chase ed 1884)."

554 US at 626.

1   response to identifiable threats to public safety stemming from the carrying of loaded

2   firearms in public within a city, when the conduct creates an unreasonable and unjustified

3   risk of harm to members of the public.  The ordinance reflects a legislative determination

4   that the risk of death or serious injury to members of the public moving about in public

5   places is increased by the threat posed by individuals who recklessly fail to unload their

6   firearms.

7          With those principles in mind, we now turn to defendant's overbreadth

8   challenge and examine the instances in which we have allowed overbreadth challenges in

9   Article I, section 27, cases.

10  C.     *Defendant's Article I, Section 27, Overbreadth Challenge*

11         Defendant's overbreadth argument is that the ordinance, by prohibiting the

12  possession or carrying of loaded firearms in all public places, unduly limits the

13  constitutionally protected activity of self-defense.  We have allowed overbreadth

14  challenges in Article I, section 27, cases on two occasions.  In *Blocker*, 291 Or 255, for

15  the first time, we addressed an overbreadth challenge in an Article I, section 27, case

16  where a statute criminalized the mere possession of certain weapons, including the

17  possession of a billy club, without regard to the application of the statute to the facts of

18  that particular case.  Although we had previously addressed such overbreadth challenges

19  only in freedom of expression cases, we gave no justification for extending the doctrine

20  to Article I, section 27, cases.  We simply referred to an "overbroad" challenge "as that

21  term has been developed by the United States Supreme Court" and "conclude[d] that it is

22  proper for us to consider defendant's 'overbreadth' attack to mean that the statute swept so

broadly as to infringe rights that it could not reach, which in this setting means the right

to possesses arms guaranteed by § 27." *Id.* at 261-62.

In *Hirsch/Friend*, 338 Or 622, we considered, and rejected on the merits, a

facial overbreadth challenge under Article I, section 27, to a statute prohibiting felons

from possessing firearms (ORS 166.270(1)). We discussed the parties' arguments and the

characteristics of overbreadth challenges as follows:

> "The state is correct that, when bringing certain facial constitutional
> challenges to a statute, the challenger ordinarily must establish that the
> statute is unconstitutional in all its applications. Where that principle
> applies, if the challenger is unable to establish facial unconstitutionality in
> that manner, then the challenger is left to argue only that the statute is
> unconstitutional as applied to the particular facts at hand.

> "However, defendants here do not assert that ORS 166.270(1) is
> unconstitutional on its face because it violates Article I, section 27, in all its
> applications. Rather, they particularly argue that, on its face, that statute is
> unconstitutionally overbroad. The term 'overbreadth' connotes a particular
> type of facial constitutional challenge in which the challenger contends that,
> although a statute constitutionally could apply in some circumstances, it
> impermissibly, and necessarily, impinges on a constitutional guarantee in
> other circumstances by prohibiting conduct that is constitutionally
> protected. Unlike with other facial challenges, a challenger raising an
> overbreadth challenge need not demonstrate that the statute at issue is
> unconstitutional under the particular circumstances at hand. Rather, the
> challenger will prevail in his or her facial challenge if the court concludes
> that the statute in question prohibits constitutionally protected conduct of
> any kind."

*Id.* at 627-28 (internal citation and footnote omitted). In *Hirsch/Friend*, we limited our

justification for permitting an overbreadth challenge under Article I, section 27, to a

1    citation of *Blocker* and the citation of several freedom of expression and assembly cases.[9]

2    Indeed, *Hirsch/Friend* could be easily misread as authority for asserting overbreadth

3    challenges whenever any statute, on its face, impinges on conduct protected by any

4    constitutional provision. *See id.* at 628-29.

5            Thus, in *Blocker* and *Hirsch/Friend*, this court has addressed overbreadth

6    challenges in Article I, section 27, in response to particular arguments raised by the

7    parties in those cases. In neither case did the state counter the defendants' overbreadth

8    theories by claiming that such a theory was unavailable under Article I, section 27.

9    Consequently, this court had no occasion to consider whether an overbreadth challenge

10   should be allowed in Article I, section 27, cases. Both the city and *amicus* now urge us to

11   limit cognizable constitutional challenges under Article I, section 27, to "as applied"

12   challenges and facial challenges that do not raise issues of overbreadth. The Court of

---

[9]    In *Hirsch/Friend*, we specifically referred to freedom of expression cases (Article I, section 8) and right to peaceable assembly cases (Article I, section 26) as illustrative of when we have addressed overbreadth challenges:

> "To illustrate, this court on many occasions has addressed overbreadth challenges involving Article I, section 8, of the Oregon Constitution, which delineates constitutionally protected conduct by guaranteeing the right to free expression of opinion and the right to speak, write, or print freely on any subject whatever. *See, e.g.*, *City of Hillsboro v. Purcell*, 306 Or 547, 556, 761 P2d 510 (1988); *State v. Ray*, 302 Or 595, 733 P2d 28 (1987) (both agreeing with claims asserting overbreadth under Article I, section 8). More recently, this court also addressed an overbreadth challenge invoking both Article I, section 8, and Article I, section 26, which delineates constitutionally protected conduct by guaranteeing the right to peaceable assembly. *State v. Ausmus*, 336 Or 493, 85 P3d 864 (2004)."

338 Or at 628.

1    Appeals, in this case, also questioned the justification for recognizing overbreadth

2    challenges under Article I, section 27.[10]  We accept the opportunity to examine the

3    justification for recognizing overbreadth challenges in Article I, section 27, cases.

4    The city and *amicus* contend that the strong rationale justifying overbreadth

5    challenges whenever laws might "chill" freedom of expression does not apply in the

6    context of Article I, section 27, cases.  The rationale for recognizing overbreadth

7    challenges in First Amendment free speech cases has been articulated by the United

8    States Supreme Court as follows:

9            "We have provided this expansive remedy out of concern that the
10          threat of enforcement of an overbroad law may deter or 'chill'
11          constitutionally protected speech -- especially when the overbroad statute
12          imposes criminal sanctions.  Many persons, rather than undertake the
13          considerable burden (and sometimes risk) of vindicating their rights

---

[10]    The Court of Appeals stated:

"It is also worth noting that this 'overbreadth' rule derives from United States Supreme Court cases under the First Amendment, *State v. Blocker*, 291 Or 255, 261, 630 P2d 824 (1981), and is, in federal law, limited to such cases, *Broadrick v. Oklahoma*, 413 US 601, 611, 93 S Ct 2908, 37 L Ed 2d 830 (1973).  As the Fourth Circuit has explained, overbreadth analysis addresses a 'speech-specific problem, [*Broadrick*] at 611-12. * * * [O]verbroad regulations [of expression] can easily encourage speakers to modify their speech, shifting it away from controversy.  *No analogous arguments obtain in the Second Amendment context*.'  *U.S. v. Chester*, 628 F3d 673, 688 (4th Cir 2010) (emphasis added).  Nonetheless, the Oregon Supreme Court in *Blocker*, 291 Or at 261, applied First Amendment overbreadth in the context of Article I, section 27, without explaining why the doctrine should apply outside of free expression or assembly cases, and *Blocker* was cited as authority in *Hirsch/Friend*, 338 Or at 626-29 -- again without explanation or analysis."

*Christian*, 249 Or App at 4 n 1.

| | |
|---|---|
| 1 | through case-by-case litigation, will choose simply to abstain from |
| 2 | protected speech, harming not only themselves but society as a whole, |
| 3 | which is deprived of the uninhibited marketplace of ideas." |

4 *Virginia v. Hicks*, 539 US 113, 119, 123 S Ct 2191, 156 L Ed 2d 148 (2003) (internal

5 citation omitted).

6    As the Supreme Court earlier stated in *Broadrick v. Oklahoma*, 413 US

7 601, 611, 93 S Ct 2908, 37 L Ed 2d 830 (1973):

| | |
|---|---|
| 8 | "It has long been recognized that the First Amendment needs |
| 9 | breathing space * * *. Litigants, therefore, are permitted to challenge a |
| 10 | statute not because their own rights of free expression are violated, but |
| 11 | because of a judicial prediction or assumption that the statute's very |
| 12 | existence may cause others not before the court to refrain from |
| 13 | constitutionally protected speech or expression." |

14 *See also Virginia v. Black*, 538 US 343, 365, 123 S Ct 1536, 155 L Ed 2d 535 (2003);

15 *Dombrowski v. Pfister*, 380 US 479, 486-87, 85 S Ct 1116, 14 L Ed 2d 22 (1965).

16    The overbreadth doctrine has been characterized as the Supreme Court's

| | |
|---|---|
| 17 | "solution to this speech-specific problem [of a chilling effect on First |
| 18 | Amendment rights]. * * * And as expression is, by its very nature, so |
| 19 | mutable, overbroad regulations can easily encourage speakers to modify |
| 20 | their speech, shifting it away from controversy. No analogous arguments |
| 21 | obtain in the Second Amendment context." |

22 *United States v. Chester*, 628 F3d 673, 688 (4th Cir 2010). The Supreme Court has not

23 allowed overbreadth challenges in the context of commercial speech, *Bates v. State Bar*

24 *of Arizona*, 433 US 350, 380, 97 S Ct 2691, 53 L Ed 2d 810 (1977) (justification for

25 allowing overbreadth challenge "applies weakly, if at all, in the ordinary commercial

26 context"), and has not allowed such challenges to laws outside the First Amendment area,

27 *see, e.g.*, *Schall v. Martin*, 467 US 253, 268 n 18, 104 S Ct 2403, 81 L Ed 2d 207 (1984)

1    (noting that "outside the limited First Amendment context, a criminal statute may not be

2    attacked as overbroad").

3            As we earlier established, the legislature may specifically regulate the

4    manner of possession and use of protected weapons to promote public safety as long as

5    the exercise of that authority does not unduly frustrate the right to bear arms guaranteed

6    by Article I, section 27.  On examination, we now conclude that the justification for

7    recognizing overbreadth challenges in cases involving freedom of expression and

8    peaceable assembly does not apply in the context of Article I, section 27, cases.  We

9    agree with the city and *amicus* that, unlike protected speech and assembly, recognizing

10   overbreadth challenges in Article I, section 27, cases is not necessary because the

11   enforcement of an overbroad restriction on the right to bear arms does not tend to

12   similarly deter or "chill" conduct that that provision protects.

13           We also emphasize the disadvantage of recognizing overbreadth challenges

14   to laws without a substantial justification for doing so.  In *Hicks*, the Supreme Court

15   discussed that disadvantage in the First Amendment area:

16           "[H]owever, there comes a point at which the chilling effect of an
17           overbroad law, significant through it may be, cannot justify prohibiting all
18           enforcement of that law -- particularly a law that reflects legitimate state
19           interests in maintaining comprehensive controls over harmful,
20           constitutionally unprotected conduct.  For there are substantial social costs
21           *created* by the overbreadth doctrine when it blocks application of a law to
22           constitutionally unprotected speech, or especially to constitutionally
23           unprotected conduct."

24   539 US at 119 (internal quotation marks and citation omitted; emphasis in original).

25           As the Supreme Court stated in *Broadrick*, "[a]pplication of the overbreadth

doctrine [in the First Amendment area] is, manifestly, strong medicine.  It has been employed by the Court sparingly and only as a last resort."  413 US at 613.  When an overbroad law cannot be narrowly construed, a successful overbreadth challenge will often result in the striking of major parts of an otherwise valid law reflecting legitimate state interests.  Moreover, overbreadth challenges tend to raise hypothetical questions about the application of laws untethered by facts on the ground.  Overbreadth challenges also ask courts to determine the rights of parties who are not before the court.  That is why, as a general rule, the constitutionality of laws are traditionally determined in the context of an actual factual setting that makes a particular determination of the rights of the parties necessary.  *See, e.g.*, *Jensen v. Whitlow*, 334 Or 412, 421, 51 P3d 599 (2002) (stating that effect); *Stevens v. City of Cannon Beach*, 317 Or 131, 147, 854 P2d 449 (1993) (same).

For the foregoing reasons, we hold that overbreadth challenges are not cognizable in Article I, section 27, challenges.  As such, the justification for recognizing overbreadth challenges in freedom of expression and assembly cases does not apply in the context of Article I, section 27, cases -- a question that we were not asked to decide in *Blocker* and *Hirsch/Friend*.  *See Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000) ("Consistent with the [doctrine of *stare decisis*], we remain willing to reconsider a previous ruling under the Oregon Constitution whenever a party presents to us a principled argument suggesting that, in an earlier decision, this court wrongly considered or wrongly decided the issue in question.").  To the extent that *Blocker* and *Hirsch/Friend* may provide authority for recognizing overbreadth challenges in Article I,

1   section 27, cases, we overrule those cases. *Blocker* and *Hirsch/Friend* otherwise remain

2   good law.

3          Accordingly, we do not address defendant's overbreadth challenge in this

4   case. Instead, we consider defendant's constitutional challenge as a conventional facial

5   challenge

6   D.      *Article I, Section 27, Facial Challenge*

7          Our analysis of defendant's facial challenge is limited to whether the

8   ordinance is capable of constitutional application in any circumstance. *State v.*

9   *Sutherland*, 329 Or 359, 365, 987 P2d 501 (1999) ("For a statute to be facially

10  unconstitutional, it must be unconstitutional in all circumstances, *i.e.*, there can be no

11  reasonably likely circumstances in which application of the statute would pass

12  constitutional muster."). We begin by observing that the ordinance expressly allows a

13  person to knowingly possess or carry a loaded firearm in a public place if the "person [is]

14  licensed to carry a concealed handgun." PCC 14A.60.010(C)(3). Thus, the ordinance is

15  not a total ban on possessing or carrying a firearm for self-defense in public like those

16  bans that this court held violated Article I, section 27, in previous cases. *See Blocker*,

17  291 Or at 259 (prohibition of "mere possession" of billy club in public without specific

18  regulation of use or manner of possession a violation of Article I, section 27); *Delgado*,

19  298 Or at 403-04 (same holding with respect to mere possession of a switchblade knife in

20  public: "The problem here is that ORS 166.510(1) absolutely proscribes the mere

21  possession or carrying of such arms. This the constitution does not permit.").

22          Here, therefore, it cannot be argued that "there can be no reasonably likely

22

1  circumstances in which application of [the ordinance] would pass constitutional muster."

2  *Sutherland*, 329 Or at 365. As just one example, the ordinance permits a person who is

3  licensed to do so to carry a firearm for self-defense. PCC 14A.60.010(C)(3). We

4  therefore reject defendant's facial challenge to the ordinance under Article I, section 27.

5  E.  *Defendant's Second Amendment Challenge*

6  Defendant also challenges the validity of the ordinance under the Second

7  Amendment to the United States Constitution. The Second Amendment provides that

8  "[a] well regulated Militia, being necessary to the security of a free state, the right to the

9  people to keep and bear arms, shall not be infringed." Defendant bases his challenge on

10  the Supreme Court decisions in *Heller*, 554 US 570 (recognizing an individual right to

11  keep and bear arms for the purpose of self-defense and invalidating legislation banning

12  handgun possession in the home), and *McDonald v. City of Chicago*, ___ US ___, 130 S

13  Ct 3020, 177 L Ed 2d 894 (2010) (holding that the individual rights recognized in *Heller*

14  are applicable to states by virtue of the Due Process Clause of the Fourteenth Amendment

15  to the United States Constitution).

16  In *Heller*, the Supreme Court addressed Second Amendment challenges to

17  a number of prohibitions on the possession of handguns enacted by the District of

18  Columbia. Those prohibitions included, in relevant part, the criminalization of the

19  carrying of unregistered firearms and a prohibition on the registration of handguns, and a

20  requirement that residents keep lawfully owned firearms unloaded and disassembled or

21  bound by a trigger lock or similar device. The respondent was a special police officer

22  whose application "for a registration certificate for a handgun that he wished to keep at

1   home" was refused by the District. *Heller*, 554 US at 575. The Court characterized the

2   issue for determination as "whether a District of Columbia prohibition on the possession

3   of usable handguns in the home violates the Second Amendment to the Constitution." *Id.*

4   at 573.

5           After an extensive analysis of the text and historical circumstances

6   pertaining to the Second Amendment, the Court invalidated the District of Columbia

7   statutes as a total ban on handgun possession in the home and an effective ban on the

8   possession of lawful firearms in the home, because the requirements rendered the

9   firearms inoperable. In so doing, the Court explained:

10        "There seems to us no doubt, on the basis of both text and history,
11        that the Second Amendment conferred an individual right to keep and bear
12        arms. Of course the right was not unlimited, just as the First Amendment's
13        right of free speech was not. Thus, we do not read the Second Amendment
14        to protect the right of citizens to carry arms for *any sort* of confrontation,
15        just as we do not read the First Amendment to protect the right of citizens
16        to speak for *any purpose*."

17   *Id.* at 595 (internal citations omitted; emphasis in original). Turning to the District of

18   Columbia laws at issue, the Court further explained:

19        "As we have said, the law totally bans handgun possession in the home. It
20        also requires that any lawful firearm in the home be disassembled or bound
21        by a trigger lock at all times, rendering it inoperable.

22        "* * * [T]he inherent right of self-defense has been central to the
23        Second Amendment right. The handgun ban amounts to a prohibition of an
24        entire class of 'arms' that is overwhelmingly chosen by American society
25        for that lawful purpose. The prohibition extends, moreover, to the home,
26        where the need for defense of self, family, and property is most acute.
27        Under any of the standards of scrutiny that we have applied to enumerated
28        constitutional rights, banning from the home 'the most preferred firearm in
29        the nation to "keep" and use for protection of one's home and family,'
30        would fail constitutional muster."

1  *Id.* at 628-29 (internal citations omitted).

2         In reaching that result, the Court emphasized that the Second Amendment

3  right to keep and bear arms is not absolute and that lawful regulatory measures have been

4  long recognized under the Second Amendment and state analogues:

5         "Although we do not undertake an exhaustive historical analysis today of
6         the full scope of the Second Amendment, nothing in our opinion should be
7         taken to cast doubt on longstanding prohibitions on the possession of
8         firearms by felons and the mentally ill, or laws forbidding the carrying of
9         firearms in sensitive places such as schools and government buildings, or
10        laws imposing conditions and qualifications on the commercial sale of
11        arms."

12 *Id.* at 626-27 (footnote omitted).  The Court also noted that it identified those

13 "presumptively lawful regulatory measures only as examples; our list does not purport to

14 be exhaustive."  *Id.* at 627 n 26.

15        In this case, defendant argues that *Heller*'s recognition of an individual right

16 to keep and bear arms for the purpose of self-defense within the home implies a right to

17 keep and carry loaded firearms in public without restriction.  However, *Heller* does not

18 support that expansive proposition.  Further, we have described how the ordinance is not

19 a total ban on the possession of firearms but, instead, specifically regulates the manner of

20 possession and use of firearms in public places.  As previously emphasized, the ordinance

21 expressly allows a person to knowingly possess or carry a loaded firearm in public if the

22 "person [is] licensed to carry a concealed handgun."  PCC 14A.60.010(C)(3).

23        Defendant further contends that this court should apply strict scrutiny in

24 examining whether the ordinance infringes upon his Second Amendment rights.  In

25 *Heller*, the Supreme Court did not designate a standard of review for courts to apply to

1    Second Amendment challenges, concluding that the District of Columbia statutes failed

2    constitutional muster "[u]nder any of the standards of scrutiny [the Court has] applied to

3    enumerated constitutional rights."  554 US at 628 (footnote omitted).  However, the

4    Court did expressly reject a test limited to ascertaining whether a challenged regulation

5    lacks a rational basis, reasoning that, if a rational basis test applied, "the Second

6    Amendment would be redundant with the separate constitutional prohibitions on

7    irrational laws, and would have no effect."  *Id.* at 628 n 27; *see also id*. at 634-35

8    (majority also rejected the interest-based balancing test proposed by dissent).

9            Drawing on that discussion in *Heller*, federal courts have employed a two-

10   pronged approach in examining Second Amendment challenges.  Under that approach, a

11   reviewing court first "ask[s] whether the challenged law imposes a burden on conduct

12   falling within the scope of the Second Amendment's guarantee."  *United States v.*

13   *Marzzarella*, 614 F3d 85, 89 (3d Cir 2010), *cert den*, __ US __, 131 S Ct 958 (2011).  If

14   it does, then the reviewing court must "evaluate the law under some form of means-end

15   scrutiny."  *Id.*  Under that approach, we conclude in the first instance that the ordinance

16   does, to some extent, burden protected conduct falling within the scope of the Second

17   Amendment's guarantee.[11]  Accordingly, we also look to federal law for guidance as to

---

[11]     In *Heller*, the Supreme Court stated that "the *central component*" or "core" of the protection guaranteed by the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.  554 US at 599, 630 (emphasis in original).  Thus, *Heller* focused on the individual right to self-defense within the home.  Although *Heller* did not define the scope of the right to self-defense outside the home, we read the opinion as recognizing a right to self-defense outside the

1     the appropriate level of scrutiny to apply to the ordinance.

2          Because *Heller* provided only general guidance for analyzing Second

3     Amendment challenges without designating the precise level of scrutiny to be applied,

4     federal courts have attempted to determine an appropriate standard of review on a case-

5     by-case basis. Some courts have applied a strict scrutiny standard, which requires courts

6     to examine whether a challenged law is narrowly tailored to serve a compelling

7     governmental interest. *See Ezell v. City of Chicago*, 651 F3d 684, 707 (7th Cir 2011). In

8     *Ezell*, for example, the court issued a preliminary injunction preventing enforcement by

9     the city of ordinances that mandated firing range training as a prerequisite to lawful gun

10     ownership and that prohibited firing ranges within the city. The court did so because the

11     city did not demonstrate why more modest burdens on the Second Amendment, rather

12     than an absolute restriction, would not advance the city's objectives. The court viewed

13     the ordinances as "a severe burden on the core Second Amendment right of armed self-

14     defense * * * requir[ing] an extremely strong public interest justification and a close fit

15     between the government's means and its end." *Id.* at 708; *see also Marzzarella*, 614 F3d

16     at 96 (recognizing that strict scrutiny may apply to some Second Amendment challenges

17     but does not "apply automatically" in all such challenges).

18          However, the majority of federal courts to date have applied an

---

home to a degree yet to be determined by the Court. We do not, however, read *Heller* as interpreting the Second Amendment to confer an unlimited right to carry loaded firearms in all public places, as argued by defendant.

1 intermediate scrutiny standard of review to most Second Amendment challenges.[12] "To

2 pass constitutional muster under intermediate scrutiny, the government has the burden of

3 demonstrating that its objective is an important one and that its objective is advanced by

4 means substantially related to that objective." *United States v. Williams,* 616 F3d 685,

5 692 (7th Cir), *cert den,* __ US __, 131 S Ct 805 (2010); *see also Marzzarella*, 614 F3d at

6 96-97 (applying intermediate scrutiny because law should merit a less stringent standard

7 than applied to more intrusive statutes in *Heller*); *Chester*, 628 F3d at 682-83

8 (intermediate level of scrutiny applied such that government was required to demonstrate

9 a reasonable fit between the regulation and its substantial government objective).

10       Our review of federal law suggests that a strict scrutiny review in Second

11 Amendment cases is appropriate only when a law imposes an absolute restriction on

12 constitutionally protected activity. Such is not the case here. As earlier described, the

13 ordinance does not absolutely restrict the individual right to bear arms in public for the

---

[12]     *See Marzzarella*, 614 F3d at 96-97 (applying intermediate scrutiny to uphold conviction for possession of a handgun with an obliterated serial number); *United States v. Yancey*, 621 F3d 681, 687 (7th Cir 2010) (same, with respect to prohibiting illegal drug users from firearm possession); *Chester*, 628 F3d at 682-83 (applying intermediate level of scrutiny to uphold conviction for possessing a firearm after being convicted of a misdemeanor crime of domestic violence); *United States v. Reese*, 627 F3d 792, 800-04 (10th Cir 2010), *cert den,* ___ US ___, 131 S Ct 2476 (2011) (statute prohibiting the possession of all types of firearms while subject to a domestic protection order held valid under immediate scrutiny standard); *United States v. Booker*, 644 F3d 12, 25 (1st Cir 2011), *cert den,* ___ US ___, 132 S Ct 1538 (2012) (Lautenberg Amendment prohibiting gun possession by individuals with domestic violence conviction upheld because it substantially promoted important governmental interest in preventing domestic gun violence).

1    purpose of self-defense.  *See* PCC 14A.60.010(C)(3) (allows person to possess or carry

2    loaded firearm in public places if person licensed to carry a concealed handgun).  The

3    ordinance, as tailored, also makes additional exceptions to the prohibition of possession

4    or carrying loaded firearms in public places, some of which lessen the burden of the

5    ordinance on Second Amendment rights.  See *Christian*, ___ Or at ___ n 5 (slip op at 5 n

6    5) for 14 exceptions set forth in PCC 14A.60.010(C).  Accordingly, we apply the

7    standard of intermediate scrutiny to review the ordinance.

8           Applying the standard of intermediate scrutiny, we conclude that the city

9    has demonstrated that it is important to protect the public from the many risks associated

10   with the presence of loaded firearms in public places.  We also conclude that enforcement

11   of the ordinance, as carefully drawn, is substantially related to that objective and

12   advances that objective.  *See Williams*, 616 F3d at 692.  The city has demonstrated a

13   sufficiently close fit between the ordinance and the city's substantial objective of

14   protecting the public.  *See Chester*, 628 F3d at 682-83.  Thus, the ordinance does not

15   violate the Second Amendment to the United States Constitution.

16                           III.  CONCLUSION

17          For the reasons explained, we hold that the ordinance is constitutional both

18   under Article I, section 27, of the Oregon Constitution and under the Second Amendment

19   to the United States Constitution.

20          The decision of the Court of Appeals and the judgment of the circuit court

21   are affirmed.